UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | Case No. 24-cr-187 |
| v. | : | |
| | : | |
| MASON PORTER, | : | |
| | : | |
| Defendant | : | |

### GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. Mason Porter has pleaded guilty to two second degree misdemeanors, a violation of 40 U.S.C. § 5104(e)(2)(D) (disorderly or disruptive conduct on the grounds or in the buildings of the United States Capitol) (Count Three) and a violation of 40 U.S.C. § 5104(e)(2)(G), (parading, demonstrating, or picketing in any Capitol building) (Count Four). For the reasons set forth herein, the government requests that this Court sentence Porter to 30 days incarceration on Count Three and 24-months' probation on Count Four. The government also requests that this Court impose 60 hours of community service, and, consistent with the plea agreement in this case, $500 in restitution.

**I.    Introduction**

Defendant Mason Porter, a 39-year-old industrial mechanic who received honorable discharge from the United States Army in 2007, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of Congress's certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020

1

Presidential election, injured more than one hundred police officers, and resulted in more than 2.9 million dollars in losses.[1] Porter pled guilty to violations of 40 U.S.C. 5104(e)(2)(D) and (e)(2)(G).

The Court must also consider that Porter's conduct on January 6, like the conduct of scores of other defendants, took place in the context of a large and violent riot that relied on numbers to overwhelm police, breach the Capitol, and disrupt the proceedings. But for his actions alongside so many others, the riot likely would have failed. Here, the facts and circumstances of Porter's crime support a sentence of 30 days incarceration on Count Three and 24-months' probation on Count Four. The government also requests that this Court impose 60 hours of community service, and, consistent with the plea agreement in this case, $500 in restitution in this case.

II.     **Factual and Procedural Background**

*The January 6, 2021 Attack on the Capitol*

To avoid unnecessary exposition, the government refers to the general summary of the attack on the U.S. Capitol. *See* ECF No. 1.

*Defendant Porter's Role in the January 6, 2021 Attack on the Capitol*

On January 6, 2021, Porter traveled from Ohio to Washington, D.C. with friends from work. Porter attended what he called the pro-Trump rally near the Ellipse in Washington, D.C. After listening to then President Trump's speech, Porter walked to the Capitol building. While on

---

[1] As of July 7, 2023, the approximate losses suffered as a result of the siege at the United States Capitol was $2,923,080.05. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police. The Metropolitan Police Department ("MPD") also suffered losses as a result of January 6, 2021, and is also a victim. MPD recently submitted a total of approximately $629,056 in restitution amounts, but the government has not yet included this number in our overall restitution summary ($2.9 million) as reflected in this memorandum. However, in consultation with individual MPD victim officers, the government has sought restitution based on a case-by-case evaluation.

Capitol grounds, Defendant helped another rioter attempt to scale one of the walls of the Capitol building. Porter walked into the Capitol building through the Parliamentarian Doors, which are located on the Senate side of the building. Defendant entered the Capitol at approximately 2:45 PM. At the time that he entered, alarms could still be heard in the doorway. After entering, Porter took photos of himself and peered into a nearby office.



*Image 1: Porter taking a photo of himself after he breached the Capitol building, Porter circled in yellow*

The crowd chanted, "USA!" and officers deployed chemical irritants. When Porter entered the Capitol building, a line of police officers tried to prevent rioters from going further into the building. Porter joined the crowd and overran the officers. As officers tried to re-establish a line, members of the crowd chanted, "get out of the way" and "forward." Porter continued further into the building as the rioters continued to break police lines and cheer as they went further into the building. He watched as other rioters pushed officers. Porter remained in the building until law enforcement officers, some dressed in riot gear, directed him out of the building. As Porter moved

toward the exit, he grabbed an ink pen off a table in the Brumidi Corridor. Porter then complied with commands and left the Capitol building at approximately 3:07 PM. Porter cheered as he exited the building.



*Images 2 and 3: Porter cheers as he exits the capitol building, Porter circled in yellow*

After being directed out of the building by officers, Porter went to the east side of Capitol grounds and took photos of other rioters breaching the building.

On January 7, 2021, Porter posted a message on his Facebook page, which stated in part:

"It's funny that people are ok living in fear of losing their constitutional rights and freedoms. People take action and use their constitutional right to fight against the corruption and destruction and the future of our country is some how a bad thing.

…

Our forefather [sic] gave us the 2nd amendment because they knew power the government was gonna have. And if corrupted they knew that violence and the 2nd ammendment [sic] would be the only defense against it. Love it or hate it this is America its brick and mortar foundation was built with an understanding of this

4

happening. I don't feel shame. Note even close! There was no violence on ourside [sic] yesterday and we were UNARMED and still took the capital building. Imagine what could happen if we exercised our second amendment to the fullest. That fear is why the media is twisting the narrative in this. They knew they are vulnerable now."

*Defendant's Interview*

As part of the investigation, on April 7, 2022, the FBI interviewed Porter at his residence. During his interview with the FBI, Porter identified himself in multiple images inside the Capitol building. Porter stated that once he arrived at the Capitol building, he observed police officers helping people entering and exiting through broken windows. Porter stated that he observed people walking through the doors of the building and that he saw police officers opening a door that people walked through. Video evidence shows that statement to be false. During his interview with the FBI, Porter stated that he walked through a set of doors to enter the Capitol building and walked out the other side of the building. Porter stated that he was in a large crowd and stated that he had to move with the crowd. Porter stated, "When I was standing down there, there was no backing out of it." Hi guilty plea demonstrates that his statements to the FBI were false.

In his interview with the FBI, Porter stated that he didn't observe any violence, but did see bloody rags outside of the Capitol building. During an interview, Porter told the FBI that he wasn't there to do anything wrong, but he realized that it was wrong once he was inside the Capitol building.

*The Charges and Plea Agreement*

On April 15, 2024, the United States charged Porter by a four-count Information with violating 18 U.S.C. § 1752(a)(1) and (2) and 40 U.S.C. § 5104(e)(2)(D) and (G). On September 19, 2024, pursuant to a plea agreement, Porter pled guilty to Counts Three and Four of the Information. He also agreed to pay $500 in restitution to the Architect of the Capitol. By plea agreement, Porter agreed to pay $500 in restitution to the Architect of the Capitol.

5

### III. Statutory Penalties

Porter now faces a sentencing for violating 40 U.S.C. § 5104(e)(2)(D) and (G). As noted by the plea agreement and the U.S. Probation Office, Porter faces up to six months of imprisonment and a fine of up to $5,000 on each count. He must also pay restitution under the terms of his plea agreement. See 18 U.S.C. § 3663(a)(3); *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008). As this offense is a Class B Misdemeanor, the Sentencing Guidelines do not apply to it. 18 U.S.C. § 3559; U.S.S.G. §1B1.9.

### IV. Sentencing Factors Under 18 U.S.C. § 3553(a)

In this misdemeanor case, sentencing is guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence. In this case, as described below, the Section 3553(a) factors weigh in favor of a sentence of 30 days' incarceration, 24 months' probation, 60 hours community service, and $500 in restitution.

#### A. The Nature and Circumstances of the Offense

The attack on the U.S. Capitol on January 6 posed "a grave danger to our democracy." *United States v. Munchel*, 991 F.3d 1273, 1284 (D.C. Cir. 2021). The attack "endangered hundreds of federal officials in the Capitol complex," including lawmakers who "cowered under chairs while staffers blockaded themselves in offices, fearing physical attacks from the rioters." *United States v. Judd*, 21-cr-40, 2021 WL 6134590, at *5 (D.D.C. Dec. 28, 2021). While assessing Porter's participation in that attack to fashion a just sentence, this Court should consider various aggravating and mitigating factors. Notably, for a misdemeanor defendant like Porter, the absence of violent or destructive acts is not a mitigating factor. Had Porter engaged in such conduct, he would have faced additional criminal charges.

6

Accordingly, the nature and the circumstances of this offense establish the clear need for a sentence of incarceration in this matter.

### B. Porter's History and Characteristics

Porter's multiple convictions are concerning and show a disregard of the law. PSR ¶¶ 30-43. Porter has multiple driving under the influence convictions, multiple disorderly conduct convictions, and multiple theft convictions, some of which included sentences of time in jail. *Id*. Hi criminal history demonstrates a lack of respect for the law and should be taken into account to determine a sentence. To his credit, Porter appeared to be holding steady employment up until his shoulder injury and has been compliant with pretrial release. PSR ¶¶ 11, 84-85. While Porter's military service is laudable, it renders his conduct on January 6 all the more troubling. As a former military member, Porter was well aware that a person does not have the right to enter restricted government buildings. His voluntary decision to storm a guarded government building is disturbing in light of his former military service and training. Porter's military experience and injuries do not at all excuse his conduct on January 6.

### C. The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds was an attack on the rule of law. As with the nature and circumstances of the offense, this factor supports a sentence of incarceration, as it will in most cases, including misdemeanor cases, arising out of the January 6 riot. *See United States v. Cronin*, 22-cr-233-ABJ, Tr. 06/09/23 at 20 ("We cannot ever act as if this was simply a political protest, simply an episode of trespassing in a federal building. What this was an attack on our democracy itself and an attack on the singular aspect of democracy that makes America America, and that's the peaceful transfer of power.")

**D. The Need for the Sentence to Afford Adequate Deterrence**

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

The need for general deterrence weighs heavily in favor of incarceration in nearly every case arising out of the violent riot at the Capitol. Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration. "Future would-be rioters must be deterred." (statement of Judge Nichols at sentencing, *United States v. Thomas Gallagher*, 1:21-CR-00041 Tr. 10/13/2021 at 37). General deterrence is an important consideration because many of the rioters intended that their attack on the Capitol would disrupt, if not prevent, one of the most important democratic processes we have: the peaceful transfer of power to a newly elected President. There is possibly no greater factor that this Court must consider.

*Specific Deterrence*

The sentence must also provide specific deterrence to Porter, which in this case weighs in favor of a term of incarceration. Porter has an extensive criminal history, he assisted another rioter climb a wall, he grabbed an ink pen off of a desk, he made a social media post glorifying the political violence that occurred that day, and he made multiple false statements to the FBI.

Porter's previous disregard for the law in combination with his social media post after he breached the Capitol building also show a need for specific deterrence. Days after January 6, 2021, Porter stated that he did not feel shame for going into the Capitol building and touted, "Imagine what could happen if we exercised our second amendment to the fullest." PSR ¶ 25. In this case,

Porter's conduct, former military service, and threat of using weapons demonstrates a very real need for specific deterrence in the form of incarceration.

Porter has also not been completely forthcoming about his conduct on January 6. He has accepted responsibility for his actions by quickly taking a plea in this case. But he did not tell the FBI his whole story about all of his conduct or his motivations for being at the Capitol. Porter told the FBI that police officers were helping rioters through broken windows and open doors into the building, despite open-source video and CCTV depicting rioters over-running the door in which Porter entered. He also told the FBI that he did not witness violence, despite open-source footage showing that he witnessed multiple tussles with police.

Porter's initial thoughts on social media days after he breached the Capitol is a sign that he feared legal repercussions for his actions, not that he wished to do the right thing. Viewed in its totality, Porter's genuine but still incomplete remorse shows that a period of incarceration is necessary to specifically deter Porter from participating in a violent riot like January 6.

### E. The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, such as in this case, to assault on police officers.[2] This Court must sentence Porter based on his own conduct and relevant characteristics, but should give substantial weight to the context of his unlawful conduct: his participation in the January 6 riot.

---

[2] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

Porter has pleaded guilty to Counts Three and Four of the Information, charging him with Disorderly and Disruptive Conduct in a Capitol Building or Grounds in violation of 40 U.S.C. § 5104(e)(2)(D) and Parading, Demonstrating or Picketing in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(G), respectively. This offense is a Class B misdemeanor. 18 U.S.C. § 3559. Certain Class B and C misdemeanors and infractions are "petty offenses," 18 U.S.C. § 19, to which the Sentencing Guidelines do not apply, U.S.S.G. § 1B1.9. The sentencing factors set forth in 18 U.S.C. § 3553(a), including "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C. § 3553(a)(6), do apply, however.

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences. While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the conduct in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an

10

appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095.

In *United States v. Mark Nealy*, 23-CR-278-TSC, the defendant pleaded guilty to violating 40 U.S.C. § 5104(e)(2)(G). Like the defendant here, Nealy entered the Capitol building shortly after the breaches on the Upper West Terrace (the Senate Wing Door and the Parliamentarian Door). Also like the defendant here, Nealy walked around the interior of the Capitol building and was in the Capitol building for approximately 13 minutes—exiting at the direction of police officers. Judge Chutkan sentenced Nealy to 14 days incarceration. Unlike Nealy, Porter has an extensive criminal history and assisted another rioter who scaled a capitol building wall, which warrant a more serious sentence.

In *United States v. Lattanzi*, 22-CR-28-TSC, the defendant pled guilty to 40 U.S.C. § 5104(e)(2)(G). Lattanzi entered the Capitol at 3:22 p.m., remained in the Capitol for 5 minutes, and exited after being directed to do so by police. The defendant lied to the FBI when they first approached him, but then admitted his conduct through an attorney the next day. The defendant here also lied to the FBI and, like Lattanzi, he entered the Capitol soon after the initial breach and chose to remain inside despite the surrounding chaos. However, Lattanzi had no criminal history. Judge Chutkan imposed a sentence of 14 days' incarceration.

In *United States v. Pulaski*, 23-CR-103-TJK, Pulaski pleaded guilty to violating 40 U.S.C. § 5104(e)(2)(D) and (G). Pulaski climbed through a broken window on the Lower West Terrace during a time of violence between rioters and police into a non-public conference room. Like the Defendant here, Pulaski attempted to help a rioter gain access to the building. Pulaski, like the Defendant in this case, observed rioters engaging in violence. However, unlike the Defendant here,

Pulaski had minimal criminal history and was severely injured on January 6. This Court sentenced him to 30 days home detention, 24 months' probation, and 60 days community service.

In *United States v. Hanna et. al.*, 23-CR-272-TJK, brothers Robert and Steven Hanna, pleaded guilty to violating 40 U.S.C. § 5104(e)(2)(D) and (G), The Hannas were on the northern side of the Upper West Terrace of the Capitol building, around the time of the breaches of the Senate Wing Door, which occurred at approximately 2:13 p.m. At approximately the same time as the Defendant here, the Hannas entered the Capitol building through the Parliamentarian door— only approximately 8 minutes after it was breached, and during the height of the riot. Like Porter, they then moved north through the Capitol, and eventually encountered a line of police officers near the North Door. After remaining in the hallway near police officers for several minutes, they exited the Capitol through the North Door at the direction of police. Like Porter, they were in the building for approximately 15 minutes. They were sentenced to 45 days home detention, 24 months' probation. The Court ordered a $500 fine instead of community service so that they could spend time at work and with responsibilities at home. Although Porter entered and exited the Capitol building at the same time as the Hannas, Porter warrants a higher sentence given his social media endorsement that more could have been accomplished if he and his fellow rioters had been armed.

V.   **Restitution**

The Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011); *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to

restitution under the VWPA).[3] Generally, restitution under the VWPA must "be tied to the loss caused by the offense of conviction," *Hughey v. United States*, 495 U.S. 411, 418 (1990); identify a specific victim who is "directly and proximately harmed as a result of" the offense of conviction, 18 U.S.C. § 3663(a)(2); and is applied to costs such as the expenses associated with recovering from bodily injury, 18 U.S.C. § 3663(b). At the same time, the VWPA also authorizes a court to impose restitution "in any criminal case to the extent agreed to by the parties in a plea agreement." *See* 18 U.S.C. § 3663(a)(3). *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

Those principles have straightforward application here. The parties agreed, as permitted under 18 U.S.C. § 3663(a)(3), that Porter must pay $500 in restitution, which reflects in part the role Porter played in the riot on January 6.[4] Plea Agreement at ¶ 11. As the plea agreement reflects, the riot at the United States Capitol had caused "approximately $2,923,080.05" in damages, a figure based on loss estimates supplied by the Architect of the Capitol and other governmental agencies as of July 2023." *Id.* (As noted above in footnote 1, the amount of damages has since been updated by the Architect of the Capitol, USCP, and MPD.) Porter's restitution payment must be made to the Clerk of the Court, who will forward the payment to the Architect of the Capitol and other victim entities. *See* PSR ¶ 9.

---

[3] The Mandatory Victims Restitution Act, Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA, *Papagno*, 639 F.3d at 1096, including crimes of violence, "an offense against property … including any offense committed by fraud or deceit," "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss." 18 U.S.C. § 3663A(c)(1).

[4] Unlike under the Sentencing Guidelines for which (as noted above) the government does not qualify as a victim, *see* U.S.S.G. § 3A1.2 cmt. n.1, the government or a governmental entity can be a "victim" for purposes of the VWPA. *See United States v. Emor*, 850 F. Supp.2d 176, 204 n.9 (D.D.C. 2012) (citations omitted).

## VI. Fine

In determining whether to impose a fine, the sentencing court should consider the defendant's income, earning capacity, and financial resources. *See* 18 U.S.C. § 3572(a)(1); *See* U.S.S.G. § 5E1.2(d). The sentencing guidelines provide for a fine in all cases, except where the defendant establishes that he is unable to pay and is not likely to become able to pay any fine. U.S.S.G. § 5E1.2(a), (e) (2023).

The burden is on the defendant to show present and prospective inability to pay a fine. *See United States v. Gewin*, 471 F.3d 197, 203 (D.C. Cir. 2006) (explaining that "it makes good sense to burden a defendant who has apparently concealed assets" to prove that "he has no such assets and thus cannot pay the fine"); *United States v. Lombardo*, 35 F.3d 526, 528 (11th Cir. 1994). Here, the defendant has shown an ability to pay, thus pursuant to the considerations outlined in U.S.S.G. § 5E1.2(d), the Court has authority to impose a fine. § 5E1.2(a),(e).

## VII. Conclusion

Sentencing requires the Court to carefully balance the § 3553(a) factors. Balancing these factors, the government recommends that this Court sentence Defendant Mason Porter to 30 days' incarceration on Count Three, 24 months' probation on Count Four, 60 hours of community service, and $500 in restitution. Such a sentence protects the community, promotes respect for the law, and deters future crime by imposing restrictions on Porter's liberty as a consequence of his behavior, while recognizing his acceptance of responsibility for his crime.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By:   */s/ Taylor L. Fontan*

TAYLOR L. FONTAN
IN Bar No. 35690-53
Assistant United States Attorney
District of Columbia
601 D St. NW
Washington, DC 20530
(202) 815-8597
Taylor.Fontan@usdoj.gov

15